IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARCHWAY INSURANCE SERVICES, LLC; UNION ONE INSURANCE GROUP, LLC; NEVADA INVESTMENT PARTNERS, LLC; and TRINITY CAPITAL MANAGEMENT GROUP, LLC,** | : : : : : : | **CIVIL ACTION** <br><br> **NO. 10-5867** |
| Plaintiffs, | : : | |
| v. | : : | |
| **JAMES HARRIS; GREGORY HARRIS; HARRIS CONSULTING SERVICES, INC.; BANK OF COMMERCE AND TRUST; GARDEN CITY STATE BANK; PEABODY STATE BANK; KENDELL STATE BANK; FIRST UNITED BANK AND TRUST; KELLY DROUILLARD; and QUIVIRA CAPITAL, LLC,** | : : : : : : : : | |
| Defendants. | : | |

**DuBOIS, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**June 15, 2011**

**M E M O R A N D U M**

**I. INTRODUCTION**

　　　This case arises out of a loan a group of Pennsylvania investment firms obtained from a Kansas lender and used to fund a Nevada insurance business. When the insurance business foundered, litigation followed. In this action, the investment firms bring an array of claims against both the successors to the lender and the principals of the insurance business. In a series of five motions presently before the Court, all defendants have moved to dismiss the Complaint and/or transfer this action in whole or in part to other venues. For the reasons that follow, the

Court severs Counts I and II from Counts IV, V, VI, and VII;[1] transfers Counts I and II to the District of Nevada; and transfers Counts IV, V, VI and VII to the District of Kansas. In view of that disposition, the Court does not rule on the motions to dismiss.

## II. BACKGROUND

### A. The Parties

The plaintiffs are four Pennsylvania investment firms: Archway Insurance Services ("Archway"), Union One Insurance Group ("Union One"), Nevada Investment Partners ("NIP") and Trinity Capital Management Group ("Trinity"). They brought this action against James Harris and his son, Gregory Harris (collectively "the Harrises"), as well as a consulting business the Harrises run, Harris Consulting, Inc. ("Harris Consulting"). The Harrises live in Nevada, and Harris Consulting is a Nevada-based company. The Harrises and Harris Consulting will be referred to collectively as "the Harris Defendants" at times in this Memorandum.

Plaintiffs also asserted claims against five banks ("the Banks") they claim are the successors in interest to the institution, Brooke Credit Corporation ("Brooke"), that financed the loan at the center of this case and the individual, Kelly Drouillard, who negotiated the terms of the loan on behalf of Brooke. Also named as a defendant is Quivira Capital, LLC ("Quivira"), which plaintiffs allege is an alias name for a successor to Brooke. Drouillard is a Kansas resident. Four of the five banks are located in Kansas; the fifth is located in Maryland. Quivira is based in Kansas. The Banks, Drouillard and Quivira will be referred to collectively as "the Bank Defendants" at times in this Memorandum.

---

[1] There is no Count III in the Complaint.

B. The Loans

The Harrises are insurance brokers in Las Vegas, Nevada. Before 2005, both worked at an insurance company named Brown & Brown. (Compl. ¶ 21.) That year, Gregory Harris left Brown & Brown and formed his own insurance company, The Harris Agency, LLC ("THA") (Id. ¶ 22.) The individual principals of Archway, Union One and Trinity formed a new company, NIP, to fund THA and establish an insurance presence in Las Vegas. (Id. ¶ 23.)

Two years later, James Harris also left Brown & Brown and joined his son at THA. (Id. ¶ 25.) James Harris, however, had a non-competition agreement with Brown & Brown. (Id.) Brown & Brown filed suit against the Harrises and THA in Nevada state court, alleging, inter alia, that the diversion of James Harris's "book of business" – his portfolio of insurance clients – from Brown & Brown to THA violated the terms of the non-competition agreement. (Id.)

To settle the Nevada state court litigation, the plaintiffs in the instant action[2] offered to fund the Harrises' purchase of the book of business from Brown & Brown. (Id. ¶ 26.) The parties entered into these settlement negotiations in Nevada. As part of the negotiations, James Harris produced reports that showed the annual revenue of his book of business was $3.2 million. (Id. ¶ 27.) Thereafter, plaintiffs sought a loan to fund the purchase. (Agnew Aff. ¶ 6.) Toward that end, they initiated negotiations with Drouillard, who worked for Brooke, a Kansas-based lender. (Compl. ¶ 34; Agnew Aff. ¶ 12.) Brooke eventually agreed to lend the plaintiffs $5.25 million, a little less than 1.7 times the annual value of the book of business. (Compl. ¶ 28).

Plaintiffs and Brooke agreed that the loan would be paid in three installments: 50 percent

---

[2] The Complaint specifies different plaintiffs who were involved in different parts of the negotiation process. For simplicity, the Court will refer generically to "plaintiffs" throughout the description of the negotiation and settlement.

shortly after the agreement was executed, 25 percent in January 2008 and the final 25 percent in October 2008. (Id. ¶ 34.) In September 2007, Brooke notified plaintiffs that, as an additional requirement of the loan, plaintiffs would have to pay $36,625, ostensibly to fund a mandatory "credit" insurance policy to secure the loan in case of default. (Id. ¶ 37.)

Plaintiffs accepted the terms of the loan and entered into an Account Acquisition Agreement ("the Agreement") with Brooke on October 16, 2007. (Id. ¶ 39.) The Agreement included a forum selection clause that reads as follows:

> At Lender's option, jurisdiction and venue for any dispute arising under or in relation to this Agreement will lie only in Phillips County, Kansas or a U.S. District Court having jurisdiction over Phillips County, Kansas.

(Banks' Mot. to Dismiss or Transfer, Ex. A ¶ 16.)

Two days later, the Harrises and THA entered into a Settlement Agreement and Mutual Release of Claims ("Settlement Agreement") with Brown & Brown. (Compl. ¶ 33.) Under the terms of the Settlement Agreement, the Harrises and THA acquired James Harris's book of business from Brown & Brown for $5.25 million. (Id.)

Once the agreements were signed, the Harrises created budgets for THA, and plaintiffs funded the operations of THA in accordance with those budgets. (Id. ¶ 40-41.) Plaintiffs also loaned $25,000 to Diane Curry, an employee hired by the Harrises, to help her acquire a new home. (Id. ¶ 42.) The Harrises pledged to repay the loan if Curry failed to do so. (Id. ¶ 43.)

C. The Fallout

In January 2008, the entire operation began to unravel. Brooke notified plaintiffs that it would not pay the second installment under the loan agreement unless it received "personal

guarantees" from principals of the plaintiffs. (Id. ¶ 46 at 11.)[3] As a result of this alleged breach of the Agreement, plaintiffs were forced to borrow $1,312,500 – the amount of the second installment – from M&T Bank ("M&T"). (Id. ¶ 49 at 11.) The Harrises guaranteed plaintiffs that they would repay the value of the M&T loan. (Id. ¶ 48 at 11.)

Even with the M&T loan secured, the Harrises' insurance business struggled. THA could not generate sufficient income to sustain itself or repay the loans obtained for the acquisition of James Harris's book of business. (Id. ¶ 45 at 12.) Plaintiffs learned in October 2008 that James Harris's book of business had been worth substantially less than he had represented. (Id. ¶ 44 at 12.)

A raft of litigation ensued. In January 2009, THA filed for bankruptcy in the Eastern District of Pennsylvania. (Id. ¶ 46 at 12.) The bankruptcy proceedings resulted in the sale of the assets of THA to Gregory Harris for $2 million. See In re The Harris Agency, LLC, No. 09-10384 (Bankr. E.D. Pa. Jan 5, 2011) (order approving asset sale to Gregory Harris).

Also in 2009, the Banks sued Union One – one of the plaintiffs in this action – in the Eastern District of Pennsylvania for, inter alia, breach of contract related to the loan from Brooke. See Complaint, Kendall State Bank v. Union One Ins. Grp., LLC (hereinafter "Kendall I"), No. 09-494 (E.D. Pa. Feb. 4, 2009). The Banks also sought a preliminary injunction to force Union One under the management of a consultant, in accord with a contractual provision requiring oversight when the value of Union One's assets decreased. See Motion to Place Matter on Active Docket and for Preliminary Injunction to Enforce Agreement

---

[3] Because of what appears to be a typographical error, the Complaint contains two each of paragraphs 44-49.

to Appoint Management Consultant and Prevent Dissipation of Collateral, Kendall I, No. 09-494 (E.D. Pa. June 10, 2010). The judge in that case denied the motion for preliminary injunction, see Kendall I, No. 09-494 (E.D. Pa. June 23, 2010) (order denying motion for preliminary injunction), and the case was dismissed voluntarily without prejudice. See Notice of Dismissal, Kendall I, No 09-494 (E.D. Pa. Dec. 27, 2010).

On October 29, 2010, plaintiffs instituted the instant action. The claims involved are described below. Two weeks later, all of the Bank Defendants filed a separate action in the District of Kansas against three of the four plaintiffs in the action before this Court (all except Trinity). See Complaint, Kendall State Bank v. Archway Ins. Servs., LLC (hereinafter "Kendall II"), No. 10-2617 (D. Kan. Nov. 12, 2010). The Complaint in the Kansas action alleged causes of action sounding in breach of contract and replevin, as well as a request for a declaratory judgment that the Banks are not liable as successors in interest to Brooke. Kendall II is still pending in Kansas.

D. The Present Action

In the instant action, plaintiffs allege the following claims:

- Count I: Fraud against the Harrises for misrepresenting the value of their business contacts

- Count II: Breach of contract against the Harrises for failure to honor their agreements to guarantee the loan to Diane Curry and the loan from M&T

- Count IV: Breach of contract against the Banks for Brooke's failure to fund the second installment of the Agreement

- Count V: Fraud against the Banks for requiring plaintiffs to pay for a purported credit insurance policy that was never purchased or never existed

- Count VI: A claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., against the Banks for the fraudulent scheme involving credit insurance

- Count VII: A RICO claim against Drouillard for her involvement in the credit insurance scheme[4]

The parties have filed a series of motions to sever, transfer and/or dismiss the claims against them. Those motions are as follows:

- The Banks' Motion to Dismiss or Transfer
- Drouillard's Motion to Dismiss or Transfer
- Quivira's Motion to Dismiss
- The Harrises' Motion to Dismiss, Or, Alternatively, to Sever and Transfer
- Harris Consulting's Motion to Dismiss, or Alternatively, to Sever and Transfer

All of the motions are fully briefed and ripe for review. The Court turns first to the issue of severance.

## III. SEVERANCE UNDER RULE 21

As an initial matter, the Court must address the question – raised explicitly in the Harris Defendants' motions and implicitly in the motions of the Bank Defendants – whether the claims against the Harris Defendants (Counts I and II) should be severed from the claims against the Bank Defendants (Counts IV, V, VI and VII). The Court concludes that severance is warranted in this case.

---

[4] While Harris Consulting is listed as a defendant on the Complaint, no claims are asserted against it. Plaintiffs do allege that the Harrises violated their fiduciary duties to THA by diverting THA business to Harris Consulting during the THA bankruptcy proceedings. (Id. ¶ 49 at 13.) Quivira is also listed on the Complaint but is not named in any of the enumerated counts.

A. Legal Standard

Federal Rule of Civil Procedure 21 provides:

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.

Although the rule states that it applies to cases of misjoinder, "application of Rule 21 has not been [so] limited. . . . For example, Rule 21 has been invoked to preserve the court's diversity jurisdiction by dropping nondiverse parties when their presence in the action was not required. Similarly, the rule has been used to correct a defect in venue by severing the claim asserted against the party as to whom venue is improper and either transferring that portion of the action to a more convenient forum or dismissing it." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (hereinafter "Wright & Miller") § 1682 (3d ed. 2001). "A district court has broad discretion in deciding whether to sever a party pursuant to [Rule 21]." Boyer v. Johnson Matthey, Inc., No. 02-8382, 2004 WL 835082, at *1 (E.D. Pa. Apr.16, 2004).

Joinder of defendants is governed by Federal Rule of Civil Procedure 20(a)(2). That provision provides that joinder of defendants is only proper where:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Id. As a general matter, joinder of related claims and parties is encouraged. Hagan v. Rogers, 570 F.3d 146, 153 (3d Cir. 2009). Nonetheless, joinder is only proper where both elements of Rule 20(a) are met. Cooper v. Fitzgerald, 266 F.R.D. 86, 88 (E.D. Pa. 2010). The determination

whether claims arise out of the same "transaction or occurrence" is a flexible one, and courts generally apply a "case-by-case approach" in making that assessment. Miller v. Hygrade Food Prods. Corp., 202 F.R.D. 142, 144 (E.D. Pa. 2001). The "law or fact" element requires only that the claims against the parties share one common question of law or fact and is a "very low threshold." Id. at 145 (citation omitted).

    B. Analysis

Even considering the relatively permissive standard for joinder embodied in Rule 20, it is highly questionable whether the claims against the Bank Defendants and the claims against the Harris Defendants are properly joined. Plaintiffs essentially allege two separate transactions: one in which the Harrises defrauded them into lending money to fund THA and another in which the Banks loaned the plaintiffs the money they needed to make the investment in THA. There are no common questions of law between the two sets of claims, and there is almost no factual overlap.

It is not necessary, however, to resolve the question whether the parties are misjoined because, even assuming, arguendo, proper joinder, that "does not end the inquiry of whether severance is appropriate. Rather, once the court has resolved these threshold questions, it may then consider additional factors in determining whether to grant a motion to sever." Morris v. Kesserling, No. 09-1739, 2010 WL 5158412, at *4 (M.D. Pa. Dec. 14, 2010). Among these factors are:

> (1) whether the issues sought to be tried separately are significantly different from one another,
> (2) whether the separable issues require the testimony of different witnesses and different documentary proof,
> (3) whether the party opposing the severance will be prejudiced if it is granted, and

> (4) whether the party requesting the severance will be prejudiced if it is not granted.

Official Comm. of Unsecured Creditors v. Shapiro, 190 F.R.D. 352, 355 (E.D. Pa. 2000).

The first and second factors strongly favor severance in this case. The issues sought to be tried against the two sets of parties are completely separate and will require largely different sources of proof to try. The case against the Harris Defendants will center on whether they made fraudulent representations to the plaintiffs and whether they breached their contracts with plaintiffs. The case against the Bank Defendants will center on whether they made unrelated fraudulent representations and whether they breached a contract between their predecessor, Brooke, and plaintiffs.

The fourth factor also favors severance, particularly in the case of the Bank Defendants. Plaintiffs agreed to litigate in Kansas their claims arising under the contract with Brooke. If the case is not severed, however, it is doubtful the entire case could be transferred there, since the Kansas court may lack personal jurisdiction over the Harris Defendants, who are Nevada residents with seemingly few contacts with Kansas.

The third factor leans only slightly against severance. Although plaintiffs will suffer some prejudice by having to prosecute separate actions against the two sets of defendants, plaintiffs already consented, by agreeing to the forum selection clause, to pursue their litigation with the Banks in Kansas. Given the probability that the Kansas court lacks personal jurisdiction over the Harris Defendants, plaintiffs surely must have contemplated the possibility that they would have to pursue their claims against the two sets of defendants in separate actions.

Finally, for reasons that appear below, see Section IV, infra, this Court is not the proper venue for any of the claims in this case. By severing, the Court can ensure that those venue defects are cured and the claims are transferred to their proper fora.

Thus, because "the administration of justice would be materially advanced" by severance, Wyndham Assocs. v. Bintliff, 398 F.2d 614, 618 (2d Cir. 1968), the Court severs the claims against the Harris Defendants (Counts I and II) from those against the Bank Defendants (Counts IV, V, VI and VII). The Court next turns to defendants' motions to dismiss or transfer.

## IV. DEFENDANTS' MOTIONS TO DISMISS OR TRANSFER

All of the defendants argue that the Court lack personal jurisdiction over them and that this district is the improper venue to adjudicate the claims against them. They further argue that plaintiffs have failed to state claims upon which relief can be granted. The Court concludes that the Eastern District of Pennsylvania is not the proper venue for plaintiffs' claims and that the claims should be transferred to fora in which venue is properly laid.[5] The Court addresses first the venue arguments raised by the Bank Defendants, then turns to the arguments of the Harris Defendants.

   A. Venue: The Bank Defendants

      1. *Standard*

In cases, such as this one, in which subject matter jurisdiction is not founded solely on the parties' diversity of citizenship, the federal venue statute holds venue proper only in the following districts:

---

[5] Because venue is improper as to all defendants, the Court need not determine whether it has personal jurisdiction over the defendants. As noted in Section IV.A.3, infra, because of the venue infirmity, the Court must either dismiss the case or transfer it to a proper venue. 28 U.S.C. § 1406(a). The authority to effect such a transfer exists regardless of whether the Court has personal jurisdiction over the defendants. Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465 (1962).

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). The statute further provides that "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).

### 2. *Analysis*

The Court concludes that none of the three subsections of § 1391(b) is satisfied with respect to the Bank Defendants. First, for the purpose of determining venue, assuming the Court has personal jurisdiction over the Banks and Quivira, they are all deemed to reside in Pennsylvania. However, Drouillard is a Kansas resident only. Thus, the requirement of common statehood in § 1391(b)(1) has not been met.[6]

Venue is also improper under § 1391(b)(2), since a "substantial part" of the events giving rise to plaintiffs' claims against the Bank Defendants did not occur in the Eastern District of Pennsylvania. In determining whether a "substantial part" of the events occurred in the forum, a court looks "not [to] the defendant's 'contacts' with a particular district, but rather [to] the location of those 'events or omissions giving rise to the claim.'" Cottman Transmission Sys, Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994).

---

[6] An ultra-literal reading of § 1391(b)(1) could lead to the conclusion that common statehood exists because all of the Bank Defendants reside, for venue purposes, in Kansas. Section 1391(b)(1), however, only "contemplates venue in a judicial district within the state in which all defendants reside." Dashman v. Peter Letterese & Assocs., Inc., 999 F. Supp. 553, 555 (S.D.N.Y. 1998) (emphasis added).

Both sets of claims against the Bank Defendants – the breach of contract and the fraudulent misrepresentation as to the credit – occurred where the defendants are located, in Kansas. See Id. at 295 (failure to make remit payments required under contract occurs where defendant omits performance, not where plaintiff fails to receive funds); Bolus v. Morrison Homes, Inc., No. 07-1978, 2008 WL 4452658, at *4 (M.D. Pa. Sept. 30, 2008) (misrepresentations occurring over the phone occur in forum in which they are made, not where plaintiff hears them). It is true that plaintiffs' representative was within this district during much of the time the parties were negotiating the loan at issue. (See Agnew Aff. ¶ 12.) However, mere discussions with a party in the forum are not sufficient to make that forum a proper venue. Loeb v. Bank of Am., 254 F. Supp. 2d 581, 587 (E.D. Pa. 2003). This is so even where the discussions deal with the terms of the contract being negotiated. TJF Assocs., LLC v. Rotman, No. 05-705, 2005 WL 1458753, at *7-8 (E.D. Pa. June 17, 2005). Moreover, the economic harm allegedly sustained by plaintiffs in this forum from the alleged fraud and breach of contract is also insufficient to establish that a "substantial part" of the events giving rise to the claims occurred in this district. Loeb, 254 F. Supp. 2d at 587. Thus, the dictates of § 1391(b)(2) have not been satisfied in this case.

Venue is also inappropriate under § 1391(b)(3) because, for reasons that appear below, this case can proceed in the District of Kansas. Thus, there exists a "district in which the action may otherwise be brought."

In sum, this district is an improper venue under § 1391(b) for the claims against the Bank Defendants.

3. *Transfer Under 28 U.S.C. § 1406(a)*

Having determined that venue in this case is improper in this district, the Court must decide whether to dismiss the claims against the Bank Defendants or transfer those claims to a district where venue is properly laid, pursuant to 28 U.S.C. § 1406(a). That statute provides:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

A court retains the power to transfer a case from an improper venue to a proper venue even where it lacks personal jurisdiction over the defendants. Goldlawr, Inc. v. Heiman, 369 U.S. 463, 465 (1962).

As an initial matter, it is clear that this action could have been brought in the District of Kansas. Almost all of the relevant activity in this case occurred in Kansas, all but one of the Bank Defendants is based there, and all of the Bank Defendants have consented to Kansas's jurisdiction in this case by filing a parallel lawsuit there. Also, the forum selection clause, binding on plaintiffs, mandates that disputes relating to the Agreement be adjudicated in Kansas if the lender so chooses.[7] A forum selection clause "is entitled to substantial consideration" in deciding whether and where to transfer a case. Jumara v. State Farm Ins. Co., 55 F.3d 873, 880 (3d Cir. 1995). Thus, the District of Kansas is the preferred forum for this action.

---

[7] Plaintiffs contend that the Banks waived the forum selection clause by initiating the previous action in this district. Given that the clause gives the Banks the choice whether claims arising under the contract should be litigated in Kansas, however, the Banks' previous decision to litigate in this district does not serve as a waiver.
.

-14-

Next, the Court must choose whether to transfer the claims against the Bank Defendants to the District of Kansas or dismiss the claims outright. "[I]n most cases of improper venue[,] the courts conclude that it is in the interest of justice to transfer to a proper forum rather than to dismiss the litigation." 14D Wright & Miller § 3827 (3d ed. 2007); see also Holiday v. Bally's Park Place, Inc., No. 06-4588, 2007 WL 2600877, at *2 (E.D. Pa. Sept. 10, 2007) ("Generally, transfer to the proper forum is preferable to outright dismissal because it prevents repetitive motion practice and unnecessary costs."). This case is no different. Transfer in this case will save the time and expense associated with instituting a new lawsuit.

Thus, in the interest of justice, the Court transfers the claims against the Bank Defendants (Counts IV, V, VI and VII) to the District of Kansas.

B. Venue: The Harris Defendants

1. *Analysis*

The Court concludes that venue is also improper in this district as to the claims over the Harris Defendants. It is undisputed that the Harrises reside in Nevada, making the common statehood provision of the venue statute inapplicable. See 28 U.S.C. § 1391(a)(1).[8] Venue would only be proper, then, if a substantial portion of the events underlying plaintiffs' claims occurred in this district. See 28 U.S.C. § 1391(a)(2). That is not the case.

Any misrepresentation regarding the value of James Harris's book of business occurred in Nevada, where the Harrises were located and where the settlement discussions over the Harris

---

[8] Since the claims against the Harris Defendants have been severed, jurisdiction over the case against them is founded solely on the basis of diversity. Thus, the appropriate statutory provision under which venue must be analyzed is § 1391(a), not § 1391(b). This has no practical effect on the Court's analysis, however, because the "substantial part" and "common statehood" requirements in the two subsections are identical.

book of business were held. See Bolus, 2008 WL 4452658, at *4. Moreover, the Harrises' breaches of contract also occurred where the Harrises were located, in Nevada. See Cottman, 36 F.3d at 295. Any diversion of business from THA to Harris Consulting happened there as well.

Plaintiffs point out that the Harris Defendants had numerous contacts with the plaintiffs in the Eastern District of Pennsylvania, first soliciting their business and later making various trips to the district. The test for venue, however, is not the character of the defendants' contacts with the forum but rather whether a substantial part of the activities that gave rise to the claim occurred within the forum. Id. at 294; TJF Assocs., 2005 WL 1458753, at *8. In this case, they did not. Most of the activity that gave rise to the claims against the Harris Defendants occurred in Nevada. Therefore, venue is improper in this district.

### 2. *Transfer Under 28 U.S.C. § 1406(a)*

As with the Bank Defendants, the Court must decide whether to dismiss the action against the Harris Defendants or transfer it to the District of Nevada, where all of the Harris Defendants reside. The Court concludes that transferring the claims against the Harris Defendants saves the costs associated with refiling the suit. Thus, the claims against the Harris Defendants are transferred to the District of Nevada.

## V. CONCLUSION

For the foregoing reasons, the Court severs the claims against the Bank Defendants (Counts IV, V, VI and VII) from those against the Harris Defendants (Counts I and II), transfers the claims against the Bank Defendants to the District of Kansas and transfers the claims against the Harris Defendants to the District of Nevada. An appropriate order follows.